# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ANA FLAVIA DE MOURA LOCKWOOD,

        Plaintiff,

    v.

TODD MADEIROS and
THE AUTO SHOPS, LLC, d/b/a
ALLTHINGSJEEP.COM,

        Defendants.

**CIVIL ACTION**

**NO. 4:18-cv-40143-DHH**

## MEMORANDUM AND ORDER

### August 27, 2018

Plaintiff Ana Flavia De Moura Lockwood has sued Defendants Todd Madeiros and his company The Auto Shops, LLC, doing business as AllThingsJeep.com (the "Company"). See Verified Complaint, dkt. no. 1-1. Plaintiff seeks attachment of $90,000 of the Company's inventory. See dkt. no. 1-1 at 7; dkt. no. 4.[1] At the parties' request, the Court held a hearing on the motion on August 23, 2018, in anticipation of a sale of the Company's inventory that is scheduled to close on August 28. On August 22, 2018, Defendants filed an opposition to the motion, dkt. no. 7, and on August 23, 2018, immediately before the hearing, Plaintiff filed a reply comprising a six-page affidavit, dkt. no. 9.

Because I find that Plaintiff has failed to carry her burden to attach, the motion for attachment is DENIED.

---

[1] The motion actually seeks attachment in the amount of $375,000. See dkt. no. 4 at 1. At the August 23 hearing, Defendants represented that a pending sale of the Company's inventory is scheduled to close on August 28, 2018. In fairness to Plaintiff, who was unaware when the motion was filed of the particulars of the pending sale, the $375,000 amount was an estimate. At the August 23 hearing, Plaintiff reduced her attachment demand to $90,000, representing approximately 4% of the anticipated sale price.

**Plaintiff's Allegations**

Plaintiff alleges in a verified complaint, dkt. no. 1-1, that she has worked for the Company since 2010 and has reported to Madeiros at all relevant times. Madeiros spends most of his time in California but periodically travels to Massachusetts on business.

The complaint contains the following general allegation concerning Plaintiff's compensation: "Throughout the course of [Plaintiff]'s employment, the plaintiff [sic], in recognition of her value added to the Company, promised to compensate her for that value." Id. ¶ 9.

In 2017, Madeiros began considering offers to purchase the Company. At an unspecified time, Madeiros promised Plaintiff that if the Company sold for $5,000,000, he would give Plaintiff $250,000—a sum that amounted to 5% of the $5 million purchase price. Id. ¶ 11. That alleged promise is central to the case.

In June 2017, Plaintiff, while using a computer screen shared with Madeiros, discovered that Madeiros was watching pornography on a company computer, and was making the pornography visible to her and other employees. This went on for several months. In or around that September, Plaintiff confronted Madeiros about his behavior and "gave [him] an ultimatum that this behavior had to stop." Id. ¶ 15. Since then, Madeiros has treated Plaintiff with hostility.

In or around January 2018, Drake Automotive Group ("Drake") emerged as a potential purchaser of the Company. Madeiros travelled to Massachusetts that month in connection with the potential sale. During that trip, Madeiros informed Plaintiff that he did not believe he owed Plaintiff anything. But Plaintiff insisted that she was owed, and Madeiros ultimately offered her $175,000 if the sale to Drake occurred, subject to unspecified contingencies. That amount was 4.3% of the potential sale price.

The sale to Drake fell through. Plaintiff told Madeiros she wanted to put their agreement in writing. Defendant replied that "'in [his] mind' it is the same agreement we have always had." Id. ¶ 23. Plaintiff then replied, confirming that her understanding of the agreement was that she would receive "about 4% of the purchase price, like the Drake deal." Id. ¶ 24. Madeiros did not dispute that percentage, but said he would consider how to structure the agreement and then get back to her.

Plaintiff kept working for Defendants "[i]n continued reliance on the oral promises of compensation." Id. ¶ 26. Madeiros at one point offered Plaintiff and another employee a chance to buy the Company, but he ultimately chose to seek another buyer. There emerged a new potential buyer, with whom Madeiros is engaged in ongoing negotiations. Madeiros allegedly "put other business plans to increase the value of the company on hold" while conducting those negotiations. Id. ¶ 30. Plaintiff believes Madeiros and the buyer may consummate a sale before the end of the month. During a phone call in June 2018, Madeiros told Plaintiff he did not have to give her anything.

If the Company is sold, Plaintiff will have the opportunity to agree to work for the buyer. But Madeiros's unspecified actions and inactions allegedly are interfering with her ability to do so. Madeiros's conduct also allegedly caused Plaintiff to suffer emotional distress and high blood pressure, for which Plaintiff has been prescribed medication.

### Defendants' Allegations

I now summarize relevant facts in Madeiros's affidavit opposing attachment, dkt. no. 8. According to the affidavit, Plaintiff started working for the Company as a part-time bookkeeper in 2010. She was promoted several times and is now the general manager. Her compensation in 2017 was $118,560, 57% more than she made in 2016.

In May 2017, Madeiros and Plaintiff agreed on a strategic plan for the Company, and agreed that Plaintiff would be responsible for executing the plan. They agreed that if the plan were successful, the Company's value could increase from somewhere between $3.5 million and $4 million to $5 million. In May 2017, Madeiros told Plaintiff that if he sold the Company in 2018 for $5 million, he would pay her a $250,000 bonus. Madeiros never offered Plaintiff a specific percentage of the Company's sale price. The offer was expressly conditioned on the Company being sold for at least $5 million.

In August 2017, Plaintiff sent Madeiros a monthly statement indicating that the Company's revenues had declined. Plaintiff expressed to Madeiros that the decline was not her fault and that Madeiros had "set her up to fail." Id. ¶ 15. During a phone call on September 16, 2017, Plaintiff resigned with 30 days' notice. The next day, Plaintiff sent Madeiros a text message expressing, among other things, that "the reason I can't keep working for" Madeiros was that Madeiros "set[] me up to fail over and over." Id. ¶ 18.

The day of Plaintiff's text message (September 17, 2017), Madeiros approached two potential buyers: Drake, and Turn5. Four days later, Plaintiff and Madeiros agreed that Plaintiff would keep working for the Company through January 31, 2018 and would receive a $20,000 bonus for doing so. Plaintiff did so, and Madeiros paid her the $20,000 bonus.

On December 13, 2017, Madeiros entered into a letter of intent with Drake to buy the Company for $3 million at closing, plus an additional $1 million if the Company's revenues increased by $1 million in the year following the sale. Madeiros discussed with Plaintiff the negotiations with Drake. Plaintiff expressed concern about what the sale would mean for her continued employment and threatened to "blow up" the deal. Id. ¶ 23.

Concerned about Plaintiff's threat, Madeiros offered her a bonus conditioned on the sale to Drake going through. First, he offered Plaintiff $75,000 if she worked for Drake for a transition period to be agreed upon, "most likely four to six months." Id. ¶ 26. Second, he offered Plaintiff an additional $100,000 if she remained with Drake for 12 months and the Company earned $1 million in "incremental revenue" during that 12-month period. Id.

Plaintiff declined this bonus and made a counteroffer by email dated January 3, 2018. The counteroffer was a bonus of 4% of the sale price to Drake, plus 4% of the additional $1 million that Drake would owe Madeiros if the Company's revenues increased by $1 million in the year after the sale.[2] Madeiros did not agree to those proposed terms. The Drake deal was never consummated.

In May 2018, Madeiros received an offer from Turn5 to purchase the Company. On July 20, 2018, Madeiros and Turn5 agreed that Turn5 would purchase the Company's assets for approximately $2.25 million, with approximately $1 million due at closing and the rest due in 36 monthly installments.[3] Madeiros had to lower the price by tens of thousands of dollars because he could not guarantee that Plaintiff would stay and help the Company transition to Turn5's ownership. At the August 23 hearing, Defendants represented that Madeiros and Turn5 are scheduled to close the deal on August 28, 2018 at midnight.

During a phone call with Plaintiff on June 20, 2018, Madeiros offered Plaintiff a bonus of $75,000 if she agreed to employment with Turn5 for 4 to 6 months after the sale. Plaintiff at first declined, and then said she would think about it while Madeiros and Turn5 conducted due

---

[2] Plaintiff would only have received the second, $100,000 payment if Drake paid Madeiros the additional $1 million.

[3] The specific terms are as follows. Turn5 will purchase the company's assets for $2,253,881.56, with $1,008,354.67 due at closing. The final price will be reduced to reflect the value of the company's inventory on the closing date. If Turn5 becomes a Jeep apparel licensee before closing, and then sells $1.2 million of Jeep apparel in the 12 months after the closing date, then Turn5 will owe Madeiros a $600,000 "earn out." Dkt. no. 8 ¶ 32.

diligence.  On June 25, 2018, Madeiros received an email from Plaintiff's counsel rejecting the $75,000 bonus offer.

Madeiros denies ever sexually harassing Plaintiff, subjecting Plaintiff to a hostile work environment, or retaliating against Plaintiff.  He notes that he and Plaintiff often stayed at each other's houses and with each other's families while travelling on business; that Madeiros promoted Plaintiff and increased her pay numerous times; that Madeiros paid her a $20,000 bonus for staying with the Company through January 2018; and that in June 2017, Madeiros gave Plaintiff his car "to show my appreciation for her taking on the role of general manager." Id. ¶ 47.

## Law

In a federal civil action, attachment is available "under the law of the state where the court is located."  Fed. R. Civ. P. 64.  In Massachusetts, attachment of property is governed by Mass. Gen. Laws ch. 223, §§ 42-83, and is implemented through Mass. R. Civ. P. 4.1.  An order of attachment may issue only

> upon a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment.

Mass. R. Civ. P. 4.1(c).  A motion for attachment must be supported by one or more affidavits that "shall set forth specific facts sufficient to warrant the required findings and shall be upon the affiant's own knowledge, information or belief . . . ."  See Mass. R. Civ. P. 4.1(c), (h).

The central issue to be considered by the Court is whether the plaintiff is "likely to prevail on the merits and obtain damages in the necessary amount."  Aetna Cas. & Surety Co. v. Rodco Autobody, 138 F.R.D. 328, 332 (D. Mass. 1991) (citing cases).  The Massachusetts courts have not stated what standard of proof establishes a "reasonable likelihood" in this context.  See

Metro. Prop. & Cas. Ins. Co. v. Bos. Reg'l Physical Therapy, Inc., 550 F. Supp. 2d 199, 201 (D. Mass. 2008) (citation omitted).  The Oxford English Dictionary defines likely as "probable."  Likely, Oxford English Dictionary, http://www.oed.com/view/Entry/108315 (last visited Aug. 27, 2018).  Likewise, Merriam Webster's defines likelihood as "probability," and likely as "in all probability: probably."  Merriam Webster's Collegiate Dictionary 674 (10th ed. 1993).  I therefore interpret the "reasonable likelihood" standard as requiring that Plaintiff show that it is more likely than not, based on articulable reasons, that she will prevail on one or more of her claims.

## Analysis

Here, the limited record before the Court (which is not a fulsome evidentiary record that may be developed at trial), fails to establish the requisite showing for an order of attachment.  The verified complaint asserts six causes of action.  Count I alleges breach of contract.  Count II sounds in quantum meruit.  Count III seeks relief under the doctrine of quasi-contract.  Count IV is labeled "Constructive Trust."[4]  Count V alleges interference with Plaintiff's advantageous business relationships.  And Count VI alleges negligent or intentional infliction of emotional distress.  I discuss each count in turn.

### *Count I: Breach of Contract*

"The essential elements of a valid contract are an offer, an acceptance, and consideration."  Conte v. Bank of Am., N.A., 52 F. Supp. 3d 265, 268 (D. Mass. 2014) (citation omitted).  "The parties must give their mutual assent by having 'a meeting of the minds' on the

---

[4] I deny the motion as to Count IV.  "A constructive trust is, of course, a remedy rather than a cause of action . . . ."  Stevens v. Thacker, 550 F. Supp. 2d 161, 165 (D. Mass. 2008).  As such, "a constructive trust has no elements, but is instead a 'flexible tool of equity designed to prevent unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential relationship, mistake, or other circumstances.'"  Sacco v. Circosta, No. 17-P-251, 93 Mass. App. Ct. 1113, at *2 (2018) (table) (quoting Maffei v. Roman Catholic Archbishop of Boston, 449 Mass. 235, 246 (2007)).

same proposition on the same terms at the same time." Freitas v. JPMorgan Chase Bank, N.A., No. 15-cv-13493-ADB, 2017 WL 4102579, at *3 (D. Mass. Sept. 15, 2017) (quoting I&R Mech., Inc. v. Hazelton Mfg. Co., 62 Mass. App. Ct. 452, 455 (Mass. App. Ct. 2004)). "All the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." Cygan v. Megathlin, 326 Mass. 732, 733-34 (1951) (quoted by Lucy v. Hero Int'l Corp., 361 Mass. 569, 574 (1972)).

A counteroffer generally is a rejection of a prior offer, which terminates the power of acceptance of the prior offer. See Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 32 (1st Cir. 1988) (citing Restatement (Second) of Contracts § 39 (Am. Law Inst. 1981)). In other words, a counteroffer typically kills and replaces a prior offer, such that the prior offer can no longer be accepted. See id.

"A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract. If the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced." Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 411 Mass. 39, 45 (1991) (citations omitted). The word if often denotes a condition precedent. Restatement (Second) of Contracts § 223 cmt. a.

On the basis of the parties' submissions, I find that Plaintiff has failed to show reasonable likelihood of success on Count I. Specifically, the evidence fails to show a meeting of the minds on essential elements of a contract. Plaintiff asserts that Madeiros made an unconditional promise to reward Plaintiff's work by paying her a percentage of the proceeds of the sale of the Company. The following parts of the record support this assertion:

- A discussion during which Madeiros promised Plaintiff an amount that equaled 5% of the proceeds if the Company sold for $5 million dollars, see dkt. no. 1-1 ¶ 11;

- An email from Plaintiff dated January 3, 2018 (i.e., months before this lawsuit) during which Plaintiff rejected a conditional bonus, requested 4% of the sale proceeds and stated, "[t]hese were the terms that you always talked about," see dkt. no. 8-4;

- Madeiros's alleged statement to Plaintiff that a conditional offer made by Madeiros was "'in my mind' . . . the same agreement we have always had," see dkt. no. 1-1 ¶ 23; and

- The fact that whenever a prospective buyer offered to purchase the Company, Madeiros offered Plaintiff a bonus.

Madeiros vigorously challenges Plaintiff's assertion that he promised her an unconditional bonus upon the sale of the Company. He asserts that he did not offer Plaintiff a bonus based on her years of service to the Company, nor did he unconditionally offer her a percentage of the Company's sale price. See dkt. no. 8 ¶ 10. As evidence of this, Madeiros addresses in his affidavit three instances in which a payment to Plaintiff after a potential sale of the Company was discussed, and he notes that in each instance the bonus he offered Plaintiff was conditional.

The first instance—in which Madeiros offered to pay Plaintiff $250,000 if the Company sold for $5 million—involved what Plaintiff herself characterized as "an example" of the bonus calculation. Dkt. no. 9, ¶ 11. Madeiros agrees that he promised to pay Plaintiff $250,000. However, according to Madeiros, this promise was expressly conditioned on the Company's sale for $5 million. Dkt. no. 8 ¶ 11. Moreover, according to Madeiros, at the time of this discussion—May 2017—he estimated that the Company's value was around $3.5 to $4 million, and his offer was conditioned on Plaintiff executing a business strategy to increase the value of the Company so that it would sell for $5 million. See id. ¶¶ 5-9.

The second instance involved a letter of intent from Drake to buy the Company for $3 million. According to a text message proffered by Madeiros,[5] Madeiros offered Plaintiff $75,000 if she remained with Drake for 90 to 120 days after the sale, and another $100,000 if the sale contained an earn out agreement, if Plaintiff remained with Drake for 12 months after the sale, and if during that time "$1 [million] incremental revenue growth is achieved." See dkt. no. 8-3. It was in response to this proposal that Plaintiff sent Madeiros the January 3, 2018 email in which she countered with a demand for 4% of the sale price, and observed that "[t]hese are the terms you always talked about." Dkt. no. 8-4 at 1. As it turns out, Drake's letter of intent expired, and the sale to Drake did not occur.

The third instance involves the pending sale of the Company's assets to Turn5. According to Madeiros, he entered into an asset purchase agreement in July 2018 under which Turn5 will pay approximately $2.2 million—approximately $1 million due at closing, and the balance (to be calculated based on the value of the Company's inventory) in 36 monthly payments. See dkt. no. 8 ¶ 32. Madeiros alleges that when Turn5 discovered there was no guarantee Plaintiff would agree to work for Turn5, Madeiros reduced the sale price by "tens of thousands of dollars." Id. ¶ 35. Madeiros offered Plaintiff $75,000 is she would "lead the transition of the company to Turn5 and stay with [Turn5] for 4 to 6 months." Id. ¶ 38. Plaintiff declined the offer. Id. ¶¶ 39-42.

The record shows that Plaintiff clearly was a highly valued employee; indeed, Madeiros concedes, and it is undisputed, that he lowered the sale price to Turn5 by tens of thousands of dollars, precisely because he could not guarantee Plaintiff's employment to Turn5, even for 4 to

[5] Plaintiff does not dispute the text message's authenticity.

6 months.  Similarly, the record recounts that after Plaintiff quit in September 2017, Madeiros managed to reemploy her only with a $20,000 bonus.

However, the record fails to show that Plaintiff's value to the Company was memorialized in a bonus agreement that reflected a meeting of the minds.  On this record, both sides plausibly can point to evidence supporting their positions, but neither side carries the day.  In particular, Plaintiff can point to her January 3 email, written before pending litigation provided some arguable motive to fabricate, claiming that Madeiros discussed with her an unconditional bonus of 4% of the Company's sale price.  Similarly, Madeiros can point to the parties' negotiation history (and supporting correspondence) as evidence that offers of bonuses expressly contemplated conditions precedent that Plaintiff would need to fulfill.

Given these supportable differences over plainly "essential terms," it appears that the parties' negotiations did not result in a contract "definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." Cygan, 326 Mass. at 733-34.  Rather, the record presents a classic "he said-she said" dispute.  Because Plaintiff bears the burden of showing a reasonable likelihood of success, I deny the motion for attachment.  To be clear, I base this determination on the limited record presented at this stage; a trial based on a full evidentiary presentation may well yield a different result.

## *Count II: Quantum Meruit* [6]

"Recovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute." Scarpaci v. Lowe's Home Ctr., LLC, 212 F. Supp. 3d 246, 253 (D. Mass. 2016) (quoting Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 250 (1993)). Accordingly, quantum meruit is "'a contract implied in law' and/or 'a quasi-contract.'" Bushkin Assocs., Inc. v. Raytheon Co., 906 F.2d 11, 15 (1st Cir. 1990). "The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party." Liss v. Studeny, 450 Mass. 473, 479-80 (2008) (citing Salamon v. Terra, 394 Mass. 857 (1986)). Indeed, "under Massachusetts law, a claim for unjust enrichment and [a claim for] quantum meruit are treated similarly and have the same elements." Scarpaci, 212 F. Supp. 3d at 253 n.8 (citing cases).[7]

"To recover under quantum meruit, [a plaintiff] must show: (1) that it conferred a measurable benefit upon the defendants; (2) that the claimant reasonably expected compensation from the defendants; and (3) that the defendants accepted the benefit with the knowledge, actual or chargeable, of the claimant's reasonable expectation." Full Spectrum Software, Inc. v. Forte Automation Sys., Inc., 100 F. Supp. 3d 50, 58 (D. Mass. 2015) (quoting Finard & Co. v. Sitt Asset Mgmt., 79 Mass. App. Ct. 226, 229 (2011)).

---

[6] The discussion of Plaintiff's quantum meruit claim also addresses Count III, which Plaintiff labeled "quasi-contract." Dkt. no. 1-1 at 5. This is because "Massachusetts cases often use the terms quantum meruit, quasi-contract and implied contract without distinguishing among them. . . . Massachusetts law treats these claims as having the same common elements." Bolen v. Paragon Plastics, Inc., 747 F. Supp. 103, 106 (D. Mass. 1990) (citing cases); accord 485 Lafayette St. Acquisition, LLC v. Glover Estates, LLC, No. 10-2350-BLS1, 2012 WL 3216762, at *12 (Mass. Super. Ct. May 16, 2012) (citing Salamon, 394 Mass. at 859). Thus, I find that Count II and Count III are functionally indistinguishable.

[7] In Massachusetts, "quantum merit is a theory of recovery, not a cause of action . . . . In a case involving an unenforceable contract, we allow[] quantum meruit recovery, basing our reasoning on the theory of unjust enrichment." J. A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 793-94 (1986) (citations omitted), overruled on other grounds by G4S Tech. LLC v. Mass. Tech. Park Corp., 479 Mass. 721 (2018).

I find that Plaintiff has failed to show a reasonable likelihood of prevailing on a theory of unjust enrichment. Among other things, there simply is not enough evidence that Madeiros was unjustly enriched at Plaintiff's expense. As noted, there is no question that Plaintiff was a highly valued employee. However, the record also shows that Plaintiff was compensated for her services. Her average annual salary, including significant bonuses, was more than $62,000, see dkt. no. 8-2, and, according to Madeiros, Plaintiff earned over $118,000 in 2017, dkt. no. 8 ¶ 3.[8] Second, as noted above, Madeiros plausibly and supportably contends that his offers to pay Plaintiff some proceeds of the Company's sale were not for past performance, but rather were conditioned on Plaintiff remaining with the Company's purchaser in the future. Insofar as Plaintiff has not fulfilled such future conditions, there is no unjust enrichment. Finally, as to the Turn5 sale, Madeiros avers that in the absence of a guarantee to Turn5 of Plaintiff's continued employment, he had to reduce the sale price by tens of thousands of dollars. Id. ¶ 35. That averment, uncontested by Plaintiff in her reply affidavit, undermines Plaintiff's claim that Madeiros has been unjustly enriched to Plaintiff's detriment.

For these reasons, I deny the motion to attach inventory as to Plaintiff's quantum meruit and unjust enrichment claims.

### Count V: Interference with Advantageous Business Relationships

To prevail on a claim for intentional interference with advantageous business relationships,

> "a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Blackstone v. Cashman, 448 Mass. 255, 260 (2007). When [corporate]

---

[8] Plaintiff avers that her 2017 compensation was $107,000. Dkt. no. 9 ¶ 1.

officials . . . are acting "within the scope of their employment responsibilities," they can only be held liable under these theories if "their actions are motivated by actual, and not merely implied, malice[.]" Id. at 260-61. "[A]ctual malice" in these circumstances is defined as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." Id. at 261.

Thomas v. Town of Salisbury, 284 F. Supp. 3d 66, 79-80 (D. Mass. 2018) (second and third alterations in original).

I find that Plaintiff has not shown a reasonable likelihood of prevailing on this Count. I assume that her allegations support the existence of an advantageous prospective employment relationship with Turn5. Nevertheless, her evidence fails to show that Madeiros knowingly and intentionally interfered with that relationship. Rather, Madeiros has conditioned payment of a bonus to Plaintiff on Plaintiff's commitment to work for Turn5 for 4 to 6 months; but Plaintiff was always free to reject that offer—and indeed, she has. See dkt. no. 8-4. Moreover, free of the conditions that Madeiros attached to her bonus, Plaintiff remains free to negotiate more favorable employment terms from Turn5, and she avers that she in fact continues to conduct negotiations for employment with Turn5. Dkt. no. 9 ¶ 17. In addition, it appears from the record that Madeiros has every incentive to see Plaintiff employed on terms acceptable to her and Turn5: he avers that he lost tens of thousands of dollars precisely because her prospective employment could not be assured. I therefore find that the record does not show tortious interference.

However, even if the record did so, there is an absence of persuasive evidence that Madeiros' motivations were improper. Arguably, the only allegation evidencing "actual malice" by Madeiros is Plaintiff's accusation that Madeiros treated her with hostility after she confronted him about viewing pornography on the Company's shared computer system. See dkt. no. 1-1 ¶¶ 12-16. Madeiros denies those allegations in his affidavit, see dkt. no. 8 ¶¶ 44, 50-51, generating a "he said-she said" dispute on which it is not now more likely than not that Plaintiff

will prevail.  Moreover, as observed in the preceding paragraph, the record suggests that

Plaintiff's employment with Turn5 inured to Madeiros' financial benefit.  It is therefore illogical

to conclude that Madeiros acted with malice or an intent to interfere with Plaintiff's relationship

with Turn5.  Thus, I deny the motion to attach as to Count V.

*Count VI: Infliction of Emotional Distress*

The complaint alleges both negligent and intentional infliction of emotional distress.  <u>See</u>

dkt. no. 1-1 ¶ 55 ("The foregoing acts or omissions of the defendant have intentionally or

negligently inflicted emotional distress on the plaintiff.").

To prevail on a claim of negligent infliction of emotional distress, Plaintiff must show:

"1) negligence; 2) emotional distress; 3) causation; 4) physical harm manifested by objective

symptomatology; and 5) that a reasonable person would have suffered emotional distress under

the circumstances of the case."  <u>Godette v. Stanley</u>, 490 F. Supp. 2d 72, 81 (D. Mass. 2007)

(quoting <u>Payton v. Abbott Labs</u>, 386 Mass. 540, 557 (1982)).  "As with any sort of negligence,

negligence in the context of an emotional distress claim requires that the defendant have owed

plaintiff a duty of care that was breached in some way."  <u>Delmonte v. Laidlaw Envtl. Servs., Inc.</u>,

46 F. Supp. 2d 89, 98 (D. Mass. 1999) (citing <u>Urman v. South Boston Savings Bank</u>, 424 Mass.

165, 171 (1997)).

I find that the evidence offered does not establish that Plaintiff is reasonably likely to

prevail on this claim.  Plaintiff does not appear to accuse Defendants of conduct related to her

disputed bonuses that can fairly be described as negligent, nor does she allege that either

defendant owed her a duty of care that was breached.  Madeiros's viewing of pornography in the

workplace might support an NIED claim, but as noted above, Madeiros disputes Plaintiff's

allegations concerning pornography.  Whether Plaintiff ultimately can prove those allegations

with the benefit of discovery is a separate question from the assessment that the Court must make

on the limited record presented. Lastly, even assuming that by viewing pornography on a

Company computer, Madeiros breached a duty of care he owed Plaintiff, Plaintiff's evidence of

injury and causation presents a close question. As the Court understands Plaintiff's testimony at

the August 23 hearing, Plaintiff's primary concern was that another employee, Marcela, was

exposed to pornography on a computer Marcela accessed from home, where she lives with

children. Similarly, in her rebuttal affidavit, Plaintiff avers that Madeiros repeatedly watched

porn on a computer another employee was using. See dkt. no. 9 ¶ 9. Another employee's

understandable alleged distress cannot serve as Plaintiff's basis for recovery. While Plaintiff's

complaint alleges generally that "[t]he foregoing acts and omissions have resulted in significant

emotional distress to the plaintiff," see dkt. no. 1-1 ¶ 37, that legal conclusion does not offer a

factual basis for an NIED claim. For these reasons, I find that the NIED claim is insufficiently

developed to support attachment.

Second, to prevail on a claim of intentional infliction of emotional distress (also alleged

in Count VI), Plaintiff must show:

> (1) that the actor intended to inflict emotional distress or that he knew or should
> have known that emotional distress was the likely result of his conduct; (2) that
> the conduct was "extreme and outrageous," was "beyond all possible bounds of
> decency" and was "utterly intolerable in a civilized community"; (3) that the
> actions of the defendant were the cause of the plaintiff's distress; and (4) that the
> emotional distress sustained by the plaintiff was "severe."

Thomas, 284 F. Supp. 3d 66, 78 (quoting Howell v. Enter. Publ'g Co., 455 Mass. 641, 672

(2010)). In this context, "'[o]utrageous' does not encompass 'workaday insults, annoyances, or

even threats and petty oppressions,' but rather 'a high order of reckless ruthlessness or deliberate

malevolence.'" Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 229 (D. Mass. 2002) (quoting

Conway v. Smerling, 37 Mass. App. Ct. 1, 8 (1994)), aff'd, 362 F.3d 1 (1st Cir. 2004). By

another formulation, the conduct must be of a type that "no reasonable person could have been expected to endure." <u>Short v. Town of Burlington</u>, 11 Mass. App. Ct. 909, 909 (1981) (citing <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 144-45 (1976)).

Plaintiff does not accuse Defendants of engaging in conduct that meets the demanding definition of "extreme and outrageous." Madeiros's negotiation tactics are perhaps sharp, but they do not rise to extreme and outrageous. Plaintiff comes closer to meeting this standard by alleging that Madeiros made pornography visible to her in the workplace. However, even assuming for argument's sake that such conduct were extreme and outrageous, Plaintiff has not alleged that it caused her to suffer "severe" emotional distress. The complaint does not describe Plaintiff's emotional distress, other than labeling it "significant." Dkt. no. 1-1 ¶ 37. The complaint also refers to "the stress" that Plaintiff sustained, and alleges that the stress caused Plaintiff's high blood pressure. <u>Id.</u> ¶ 38. Again, these allegations do not approach the demanding IIED standard.

Finally, as to both the negligent and intentional infliction of emotional distress claims, there is sufficient record evidence to attribute any distress Plaintiff suffered merely to the stress of being in the middle of the sale of the Company, with its accompanying deadlines and stream of demands. To Plaintiff's counsel's credit, he concedes that there are potential causation issues in connection with Plaintiff's infliction of emotional distress claims.

As to both claims of infliction of emotional distress, I find that the record fails to show Plaintiff is reasonably likely to prevail. I therefore deny the motion to attach.

## **Conclusion**

Plaintiff's motion for attachment, dkt. no. 4, is DENIED.




                               /s/ David H. Hennessy
                               David H. Hennessy
                               United States Magistrate Judge